# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| H.A., and M.A.,<br><br>  Plaintiffs,<br><br>v.<br><br>TUFTS HEALTH PLAN, and CIGNA<br>BEHAVIORAL HEALTH,<br><br>  Defendants. | **MEMORANDUM DECISION AND<br>ORDER GRANTING PLAINTIFFS'<br>MOTION FOR SUMMARY JUDGMENT<br>AND DENYING DEFENDANTS'<br>MOTIONS FOR SUMMARY<br>JUDGMENT**<br><br>Case No. 2:22-cv-00476-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Now before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, the court GRANTS Plaintiffs' Motion[1] and DENIES Cigna Behavioral Health and Tufts Health Plan's Motions.[2]

## FACTUAL BACKGROUND

This case arises from an insurance coverage dispute for residential mental health treatment Plaintiff M.A. received at Fulshear Ranch Academy ("Fulshear") from August 5, 2020 to May 22, 2021.[3] The facts in the Motions are largely undisputed. Plaintiffs lodge no specific objection to any numbered facts in Defendants' Motions—though they state Cigna minimizes[4] M.A.'s mental health struggles and relied on internal notes "not communicated to the Plaintiffs

---

[1] Dkt. 59, *Plaintiffs' Motion for Summary Judgment* (*Plaintiffs' Motion*).

[2] Dkt. 57, *Cigna Behavioral Health Motion for Summary Judgment* (*Cigna's Motion*); Dkt. 58, *Tufts Health Plan Motion for Summary Judgment* (*Tufts' Motion*).

[3] *Cigna's Motion* at 1.

[4] *See* Dkt. 70, *Plaintiffs' Opposition to Cigna's Motion for Summary Judgment* (*Plaintiffs' Opposition to Cigna's Motion*) at 3; Dkt. 71, *Plaintiffs' Opposition to Tufts' Motion for Summary Judgment* (*Plaintiffs' Opposition to Tufts' Motion*) at 3–4.

prior to litigation."[5]  Cigna likewise complains "Plaintiffs fail to provide broader context," but other than one unopposed correction to a date, Cigna does not dispute Plaintiffs' facts.[6]  For its part, Tufts disputes "in part" some of Plaintiffs' stated facts either because Plaintiffs do not define or explain certain terms,[7] do not provide complete statements,[8] state characterizations as facts,[9] state legal conclusions,[10] or imply objectionable inferences.[11]  However, Tufts does not contend Plaintiffs' Motion presents any genuine issue of material fact precluding summary judgment, and Plaintiffs do not address Tufts' partial objections in their Reply.  With consideration of the parties' responses to their respective statements, the court sets forth the following facts as undisputed.

---

[5] *Plaintiffs' Opposition to Tufts' Motion* at 3–4.

[6] Dkt. 68, *Defendant Cigna Behavioral Health's Opposition to Plaintiffs' Motion for Summary Judgment* (*Cigna's Opposition to Plaintiffs' Motion*) at 4–6.

[7] *See e.g.*, Dkt. 69, *Tufts Health Plan's Opposition to Plaintiffs' Motion for Summary Judgment* (*Tufts' Opposition to Plaintiffs' Motion*) at 2 (stating Plaintiffs do not define "sub-acute residential and transitional living treatment"); *id.* at 6 (objecting to Plaintiffs' failure to explain "separate requirements for admission to an Acute Inpatient Mental Health Treatment for Adults"); *id.* at 8 (stating Plaintiffs' reference to an "unspecified neurodevelopmental disorder" is unclear).

[8] *See, e.g.*, *id.* at 4–5 (disputing Plaintiffs' Fact Nos. 15–17 on the grounds Plaintiffs provide only incomplete citations to the record); *id.* at 10–11 (disputing Plaintiffs' Fact No. 56 as an incomplete explanation of the basis for denial).

[9] *See, e.g.*, 8–9 (contending statements and conclusions of Plaintiff  H.A. do not constitute facts).

[10] *See, e.g.*, *id.* at 13 (objecting to Plaintiffs' Fact No. 63 as asserting a legal conclusion); *id.* at 14 (objecting to Plaintiffs' Fact No. 65 is a "legal argument disguised as a fact"); *id.* at 15–16 (stating Plaintiffs' Fact No. 66 assert legal questions).

[11] *See e.g.*, *id.* at 7–8 (objecting to Plaintiffs' implied inference from Cigna's response to an interrogatory); *id.* at 9–10 (disputing Plaintiffs' Fact. Nos. 53–54 "to the extent Plaintiffs ask the Court to infer M.A.'s treatment at Fulshear was medically necessary"); *id.* at 11 (objecting to any inference implying coverage denial was illegal); *id.* at 12 (objecting to any inference from Plaintiffs' Fact No. 60 equating certain treatments as analogues); *id.* at 14 (objecting to any inference from Plaintiffs' Fact No. 64 that Defendants did not comply with the law).

Plaintiff H.A. is Plaintiff M.A.'s mother.[12] H.A. is a participant in Tufts Health Plan (the Plan), which is governed by the Employee Retiree Income Security Act (ERISA).[13] M.A., as H.A.'s dependent, was a beneficiary of the Plan at all relevant times.[14]

The Plan "has a utilization management program," by which authorized reviewers evaluate whether health care services provided to beneficiaries are medically necessary and "provided in the most appropriate and efficient manner."[15] Relevant here, Tufts authorized Cigna, "a licensed utilization review agent," to review claims for mental health and substance abuse treatment for medical necessity under the Plan.[16]

## I.    M.A.'s History Before Entering Fulshear

Plaintiffs reside in Massachusetts.[17] From a young age, M.A. struggled socially and experienced bullying.[18] M.A. met with a counselor briefly in fifth grade but continued to struggle socially and academically through middle school and high school.[19] M.A. underwent a neuropsychological evaluation in 2017 that revealed she suffered from "significant general anxiety, and social anxiety."[20] Later in 2017 and 2018, M.A. began engaging in self-harm and reported suicidal ideation.[21]

---

[12] *Plaintiffs' Motion* ¶ 2.

[13] *Id.* ¶¶ 3–8.

[14] *Id.* ¶ 7.

[15] Dkt. 55-1, *Administrative Record* (*AR*) at 35.

[16] *Tufts' Motion* ¶ 10; *Plaintiffs' Motion* ¶ 4.

[17] *Plaintiffs' Motion* ¶ 1.

[18] *Plaintiffs' Motion* ¶ 20; *AR* at 274.

[19] *Plaintiffs' Motion* ¶¶ 22; *AR* at 273–76.

[20] *Plaintiffs' Motion* ¶ 24; *AR* at 437–56.

[21] *Plaintiffs' Motion* ¶¶ 27–28; *AR* at 276.

M.A. went to the hospital for evaluation in 2018, but her behavioral problems persisted.[22] M.A. continued engaging in self-harm, and she began to consume drugs and alcohol.[23]  M.A. attempted suicide on June 21, 2020 and was hospitalized at Newton-Wellesley Hospital for stabilization until June 24, 2020.[24]  A psychiatrist at Newton-Wellesley recommended inpatient psychiatric hospitalization, and M.A. was subsequently committed to McLean Hospital for further treatment.[25]  M.A. stayed at McLean until July 20, 2020.[26]  McLean treatment providers documented the following during M.A.'s stay:

    a.  June 24–25, 2020: "M.A. received provisional diagnoses that included Major Depressive Disorder, General Anxiety Disorder and ADHD, social anxiety, and an eating disorder" and, shortly afterwards, borderline personality disorder.[27]  M.A. reported she was sexually assaulted twice during high school.[28]  M.A.'s overall acute risk to harm herself or others was high.[29]

    b.  June 27, 2020: M.A. exhibited progress by participating in therapeutic group sessions and interacting with peers.[30]

    c.  June 29, 2020: M.A. exhibited decreased irritability and an improved mood.[31]

    d.  July 6, 2020: M.A. showed lack of progress.  She did not utilize coping skills and was difficult to redirect over the weekend.[32]

    e.  July 7, 2020: M.A. exhibited progress by using coping skill to deal with anxiety and presented no acute behavioral or safety concerns.[33]

---

[22] *Plaintiffs' Motion* ¶¶ 28–29, 41; *AR* at 277–78.

[23] *Plaintiffs' Motion* ¶ 44.

[24] *Id.* ¶¶ 45–46; *AR* at 482–89.

[25] *AR* at 484.

[26] *Id.* at 490–923.

[27] *Plaintiffs' Motion* ¶¶ 46–47.

[28] *AR* at 515–57.

[29] *Id.* at 519–20.

[30] *Id.* at 540.

[31] *Id.* at 541.

[32] *Id.* at 544.

[33] *Id.* at 545.

f.  July 15, 2020: M.A.'s irritability was decreased, and her mood improved.  She showed an increasing ability to utilize coping skills.  A tentative date for discharge and transition to a residential program was set.[34]

g.  July 20, 2020: M.A. was diagnosed with borderline personality disorder and general anxiety disorder at discharge.[35]  M.A. readily engaged in treatment and participated in groups and socialized with peers.  M.A.'s mood improved, and her suicidal ideation was "resol[ved]."[36]  M.A. had "no acute medical issues during [her] hospital stay," and her overall "risk of harm to self/others or inadequate self care [was] moderate."[37]  Her prognosis was fair and could be improved if M.A. "engage[d] in intensive treatment."[38]

## II.    M.A.'s Treatment at Fulshear

On July 22, 2020, M.A. entered residential treatment at Fulshear.[39]  M.A. received

treatment at Fulshear until May 22, 2021 for borderline personality, depressive, and anxiety

disorders.[40]  M.A.'s medical records at Fulshear reveal her mental health disorders manifested on

at least the following occasions:

a.  July 24, 2020: M.A. demonstrated high anxiety, poor relational skills, and a depressed mood.[41]

b.  July 26, 2020: M.A. was anxious and did not receive feedback well.[42]

c.  July 27, 2020: M.A. described her history "as if she [was] a victim of the behavior of others . . . [and] glosse[d] over whatever she has done."[43]

d.  July 31, 2020: M.A. demonstrated high anxiety and had tangential speech.[44]

---

[34] *AR* at 550.

[35]  *Id.* at 500.

[36] *Id.* at 501.

[37] *Id.*

[38] *Id.*

[39] *Plaintiffs' Motion* ¶¶ 10, 48.

[40] *AR* at 1604–05.

[41] *Id.* at 1579.

[42] *Id.* at 1572.

[43] *Id.* at 1569.

[44] *Id.* at 1544.

e. August 2, 2020: M.A. reported she sometimes had disturbing thoughts she couldn't get rid of, was frequently nervous and afraid, and sometimes had thoughts of "ending [her] life."[45]

f. August 9, 2020: M.A. was withdrawn and became increasingly anxious throughout the day.[46]

g. August 10, 2020: Police responded to Fulshear and escorted M.A. to the hospital after M.A. got into an argument with another Fulshear resident.[47] The police reported M.A. punched the Fulshear office door and broke it.[48] A Fulshear treatment provider described M.A. as dramatic and manipulative.[49] M.A. explained she broke into the office to retrieve her cellphone "so she could call her father because she wanted to go back home to Massachusetts."[50] M.A. called her father and yelled to him "that bad men were [there] to hurt her." M.A. would not stop talking and listen to the police, yelled at an officer not to touch her, and said she believed the officer was "going to drive her out into the woods."[51]

h. September 3, 2020: M.A. was mildly anxious and felt depressed.[52]

i. September 9, 2020: M.A. was anxious and stated she had a recent panic attack and wanted to leave treatment.[53]

j. October 18, 2020: M.A. stated to a mentor that "she wish[ed] she would have just killed herself so she wouldn't have to be in treatment."[54] M.A. also stated she thought she was ready to go home.[55]

k. November 11, 2020: M.A. cried and was upset about "relapsing into old behavior."[56]

l. November 16, 2020: M.A. stated she was crying every day and having trouble with roommates. M.A. "display[ed] a lot of victimizing."[57]

---

[45] *Id.* at 1521–25.

[46] *AR* at 1469.

[47] *Plaintiffs' Motion* ¶ 68; *AR* at 3077–78.

[48] *AR* at 3077.

[49] *Id.* at 3077–78.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 1349.

[53] *AR* at 1325.

[54] *Id.* at 1136.

[55] *Id.*

[56] *Id.* at 1072.

[57] *Id.* at 1053.

m. November 23, 2020: M.A. stated she was "deep in her eating disorder" and expressed frustration about roommates.[58]

n. December 5, 2020: M.A. started employment but quit after three days "because it was making her uncomfortable."[59]

o. December 7, 2020: M.A. was dysregulated, angry, and irritable.[60]

p. December 17, 2020: M.A. "struggle[ed] to attend check in, and programming," "[struggled] to communicate with peers … [and did] not attend[] A.A."[61]

q. December 28, 2020: M.A. exhibited symptoms and behaviors "demonstrating [she] continued to need [residential treatment] level of care."[62]

r. January 4, 2021: M.A. reported sleep trouble and stated she was "manic."[63]

s. January 6, 2021: M.A. stated she did not want to be at Fulshear, did not want to be sober, and often pretended because, if she did not pretend, then her providers would take things away from her.[64]

t. January 8, 2021: M.A. reported anxiety and poor decision making.[65]

M.A.'s providers also noted progress on the following occasions:

a. July 26, 2020: M.A. interacted with peers and appeared "to be enjoying herself" and reported "she was fine" though she missed her friends.[66]

b. July 30, 2020: M.A. reported she "was feeling good."[67]

c. August 2, 2020: M.A. reported she was taking her medications regularly as prescribed; she thought it "ma[de] sense" for her to be in the Fulshear program, reported she thought she had made therapeutic progress."[68]

---

[58] *Id.* at 1042.

[59] *AR* at 1012, 1020.

[60] *Id.* at 1007.

[61] *Id.* at 975.

[62] *Id.* at 971.

[63] *Id.* at 944.

[64] *Id.* at 937.

[65] *AR* at 933.

[66] *Id.* at 1573.

[67] *Id.* at 1550.

[68] *Id.* at 1531–33.

    d.   August 4, 2020: M.A. was "doing well in her community" and did not show any signs of depression.[69]

    e.   August 18, 2020: M.A. was "mostly in a good mood."[70]

    f.   August 28, 2020: M.A. was in a "happy mood . . . [and] was open and interactive."[71]

    g.   September 15–16, 2020: M.A. did not seem to be in a depressed mood, made no mention of her anxiety, and was "actively engaged in her recovery programming."[72]

    h.   October 21, 2020: M.A. was "much improved," "more relaxed, less moody and more approachable."[73]

    i.   November 1, 2020: M.A. applied for a job.[74]

    j.   November 22, 2020: M.A. was very talkative and spent time laughing.[75]

    k.   December 14, 2020: M.A. was "noticeably happier" and wanted to start reducing her medication.[76]

    l.   December 20, 2020: M.A. was "actively engaged in her recovery programming," attending A.A. meetings, and counseling sessions.[77]

    m.   January 4, 2021: M.A. was much more stable and in control of her behavior.[78]

    n.   January 7, 2021: M.A. was in a "great mood."[79]

Ultimately, Cigna approved only fourteen days of residential treatment for M.A. at Fulshear: from July 22, 2020 through August 4, 2020.[80]

---

[69] *Id.* at 1498.

[70] *Id.* at 1425.

[71] *AR* at 1377.

[72] *Id.* at 1297, 1301.

[73] *Id.* at 1108.

[74] *Id.* at 1104.

[75] *Id.* at 1049.

[76] *Id.* at 992.

[77] *AR* at 975.

[78] *Id.* at 944.

[79] *Id.* at 934.

[80] *Cigna's Opposition to Plaintiffs' Motion* ¶ 16.

### III.    The Plan Coverage Terms

There is no dispute that M.A. was a beneficiary of the Plan for the duration of her stay at Fulshear and the Plan is subject to ERISA.  The Plan provides behavioral health and substance use disorder services, which Tufts or its delegate must deem "Medically Necessary."[81]  The Plan defines "Medically Necessary" as:

> A service or supply that is consistent with generally accepted principles of professional medical practice as determined by whether that service or supply:
> - is the most appropriate available supply or level of service for the MEMBER in question considering potential benefits and harms to that individual;
> - is known to be effective, based on scientific evidence, professional standards and expert opinion, in improving health outcomes; or
> - for services and interventions not in widespread use, as based on scientific evidence.[82]

The Plan uses "Medical Necessity Guidelines" to determine Medical Necessity for covered services. The Medical Necessity Guidelines are:

- based on current literature review;
- developed with input from practicing PROVIDERS in the Service Area;
- developed in accordance with the standards adopted by government agencies and national accreditation organizations;
- updated annually or more often as new treatments, applications and technologies are adopted as generally accepted professional medical practice; and
- scientific evidence-based, if practicable.[83]

The Plan states Tufts "has entered into an agreement with Tufts Benefit Administrators ('TBA') for TBA to administer the health benefits and make available a network of PROVIDERS,"[84] and "[a]n AUTHORIZED REVIEWER reviews and approves certain services and supplies to MEMBERS.  He or she is TUFTS HEALTH PLAN's Chief Medical Officer (or

---

[81] *AR* at 35.

[82] *Id.* at 123.

[83] *Id.* at 35.

[84] *Id.* at 6.

equivalent) or someone that person names (which may include a delegate)."[85]  The Plan further

explains the Authorized Reviewer's role in the "utilization management program":

> • UTILIZATION MANAGEMENT: TUFTS HEALTH PLAN has a utilization management program.  This is employed to evaluate whether health care services provided to MEMBERS are (1) MEDICALLY NECESSARY and (2) provided in the most appropriate and efficient manner….
>
> TUFTS HEALTH PLAN considers these guidelines as well as the MEMBER's individual health care needs to evaluate on a case-by-case basis if a service or supply is MEDICALLY NECESSARY.
>
> The utilization management program sometimes includes prospective, concurrent, and retrospective review of health care services for MEDICAL NECESSITY (collectively, this comprises AUTHORIZED REVIEW) and is performed by an AUTHORIZED REVIEWER….
>
> Prospective and concurrent reviews let MEMBERS know if proposed health care services are MEDICAL NECESSARY and covered under their plan.  This allows MEMBERS to make informed decisions about their care….
>
> TUFTS HEALTH PLAN or its delegate makes coverage determinations.  You and your PROVIDER make all treatment decisions.[86]

The Plan also states inpatient behavioral health and substance use residential treatment

"may require approval by an AUTHORIZED REVIEWER."[87]  The parties do not dispute Cigna

"provides third-party claim administration services to the Plan."[88]  Cigna, which employs a

behavioral health Chief Medical Officer,[89] determines benefits for mental health treatment based

on Cigna's own standards and guidelines.[90]

---

[85] *Id.* at 117.

[86] *AR* at 35–37.

[87] *Id.*

[88] *Cigna's Motion* at 1; *Plaintiffs' Motion* ¶ 4 ("Cigna provides claims evaluation and processing services for Tufts."); *id.* ¶ 11 (identifying Cigna as Tufts' agent); *Tufts' Motion* ¶ 10 (identifying Cigna as "a licensed utilization review agent" for Tufts).

[89] *AR* at 145–47.

[90] *Cigna's Motion* ¶ 13; *Plaintiffs' Opposition to Cigna's Motion* at 3 (presenting no opposition to Cigna's statement of fact ¶ 13).

The Plan outlines four levels of mental health care to "deliver[] the most effective and most appropriate care to every patient."[91]  These include acute inpatient mental health treatment, residential mental health treatment, partial hospital mental health treatment, and intensive outpatient mental health treatment.[92]  Acute inpatient and residential treatment both provide 24-hour supervision and monitoring while partial hospital and outpatient treatment are utilized when an individual does not require a 24-hour-monitoring environment.[93]

The Plan describes the services and establishes the medical necessity criteria for each level of care.  Acute inpatient care occurs in a contained environment when an individual requires, among other things, "around-the-clock intensive, psychiatric/medical care and onsite 24 hour nursing care including continuous observation, monitoring and intervention," administration of any prescribed medications, "[a]cute management to prevent harm or significant deterioration of functions and to ensure the safety of the individual and/or others."[94]  An individual must meet each of the following medical necessity criteria to be admitted for acute inpatient mental health treatment:

> All of the following must be met:
> 1. All Elements of Medical Necessity must be met.
> 2. The individual has been diagnosed with a severe and acute mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders that is significantly impairing functioning.
> 3. One or more of the following criteria must be met:
>    A. It is likely that the individual is currently at imminent risk of causing serious bodily harm to him/herself or someone else due to a psychiatric illness, (not due to intentional criminal behavior), as evidenced by:
>       i) A recent and serious suicide attempt or threat of violence toward others involving deadly intent or plan, OR

---

[91] *AR* at 146–47.

[92] *Id.* at 144, 149–65.

[93] *Id.*

[94] *Id.* at 149.

ii) A current expression of suicidal intent or homicidal intent with a plan for bodily harm that has a high likelihood of becoming deadly or causing serious injury, OR

iii) Recent, serious and intentional self-injury along with an inability to develop a reasonable plan for safety so that 24 hour observation, safety measures, and treatment are needed in a secure setting, OR

iv) Recent violent, impulsive, and unpredictable behavior that is likely to result in harm to the individual or someone else without 24 hour observation and treatment, including the possible use of seclusion and/or restraints in a secured setting.

B. It is very likely that serious harm will come to the individual due to psychiatric illness, and that harm cannot be prevented at a lower level of care as evidenced by:

i) The individual is unable to care for self (nutrition, shelter, and other essential activities of daily living) due to his/her psychiatric condition so that imminent life-threatening deterioration is expected, OR

ii) The individual has irrational or bizarre thinking, and/or severe slowness or agitation in movements along with interference with essential activities of daily living of such severity as to require 24 hour psychiatric/medical, nursing and social service interventions.

C. The individual has a secondary condition such that treatment cannot be provided at a less restrictive level of care as evidenced by:

i) A life threatening complication of an eating disorder; OR

ii) An active general medical condition … which requires that psychiatric interventions be monitored in a 24 hour psychiatric/medical setting, OR

iii) The individual requires Electroconvulsive Therapy (ECT) and the initial trial requires a 24 hour psychiatric/medical setting.

D. Appropriate less restrictive levels of care are unavailable for safe and effective treatment."[95]

The Plan describes residential care as "transitional" treatment "focused on stabilization and improvement of functioning and reintegration with family or significant others" in a facility providing 24-hour supervision and monitoring.[96]  The medical necessity criteria for residential treatment state:

All of the following must be met:

1. All Elements of Medical Necessity must be met.

2. The individual is expressing willingness to actively participate in this level of care.

---

[95] *Id.* at 151–52.

[96] *Id.* at 153.

3. The individual has been diagnosed with a moderate-to-severe mental health disorder … and [exhibits] evidence of significant distress/impairment.

4. This impairment in function is seen across multiple settings such as work, home, and in the community, and clearly demonstrates the need for 24 hour psychiatric and nursing monitoring and intervention.

5. As a result of the interventions provided at this level of care, the symptoms and/or behaviors that led to the admission can be reasonably expected to show improvement such that the individual will be capable of returning to the community and to less restrictive levels of care.

6. The individual is able to function with some independence, [and] participate in structured activities in a group environment.

7. There is evidence that a less restrictive level of care is not likely to provide safe and effective treatment.[97]

In contrast to acute inpatient and residential care, both partial hospital and outpatient treatment are for individuals who do not require 24-hour supervision.[98]  Partial hospital treatment is for those with a mental health disorder experiencing moderate-to-severe and acute psychiatric symptoms that "compromis[e] daily functioning"[99] and is "similar in nature and intensity to that provided in an inpatient hospital setting."[100]  However, those in partial hospital treatment are able to maintain safety in the community if they have an ongoing risk of harm to self or others and the individuals are not considered a resident of the structured program.[101]  Outpatient treatment is coordinated, time-limited care "for individuals who can maintain personal safety with support systems in the community and who can maintain some ability to fulfill family, student, or work activities," but are "experiencing psychosocial stressors and/or complex family dysfunction, such that a multidisciplinary treatment team is needed to stabilize the individual."[102]

---

[97] *AR* at 156.

[98] *Id.* at 157, 186–87.

[99] *Id.* at 157–58.

[100] *Id.* at 157.

[101] *Id.*

[102] *Id.* at 162.

The only level of care utilized when an individual poses an imminent or very likely risk or threat of harm is acute inpatient treatment.[103]

Acute inpatient and residential treatment have the same criteria to qualify for a continued stay. For both:

> All of the following must be met:
> 1. The individual continues to meet all Elements of Medical Necessity.
> 2. One of more of the following criteria must be met:
>    a. The treatment provided is leading to measurable clinical improvements in the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, but the individual is not sufficiently stabilized so that he/she can be safely and effectively treated at a less restrictive level of care.
>    b. If the treatment plan implemented is not leading to measurable clinical improvements in the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, there must be ongoing reassessment and modifications to the treatment plan that address specific barriers to achieving improvement when clinically indicated.
>    c. The individual has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment.
> 3. All of the following must be met:
>    a. The individual and family are involved to the best of their ability in the treatment and discharge planning process.
>    b. Continued stay is not primarily for the purpose of providing a safe and structured environment.
>    c. Continued stay is not primarily due to a lack of external supports.[104]

## IV.    Plan Denial and Appeal Terms

The Plan provides that a member may appeal a denial of coverage based on medical necessity through an appeals process.[105] First, if a member disagrees with a coverage determination, they must file a written or oral appeal within 180 days and should include "a detailed description of [their] concern (including relevant dates, any applicable medical

---

[103] *AR.* at 149–65.

[104] *Id.* at 152, 156.

[105] *Id.* at 102–06.

14

information, and PROVIDER names)" and any documentation supporting the claim.[106]  Then

Tufts "or its delegate" will review the appeal and make a decision.[107]  If the appeal requires a

review of medical records, the member must sign and return a medical information release

authorization form within 30 days.[108]  After the medical records are provided, "an actively

practicing health care professional in the same or similar specialty as typically treats the medical

conditions . . . and who did not participate in any of the prior decisions on the case" will review

the records to make a medical necessity determination.[109]  Tufts will review this first ("Level

One") appeal and issue a decision letter "based on Medical Necessity," that includes

"identification of the specific information considered for [the] appeal and an explanation of the

basis for the decision."[110]  The decision letter will also include Tufts':

> understanding of [the] presenting symptoms or condition; diagnosis and treatment
> interventions, and the specific reasons such medical evidence fails to meet the relevant
> medical review criteria; applicable clinical practice guidelines and review criteria;
> notification of the steps for requesting external review . . . and the titles and credentials of
> the individuals who reviewed the case.[111]

If a member is not satisfied with the Level One appeal decision, a member may submit a

written request for reconsideration "where relevant medical information (1) was received too late

to review within the 30 calendar day time limit; or (2) was not received but is expected to

become available within a reasonable time period following the written resolution."[112]  The

Massachusetts Office of Patient Protection, unaffiliated with Tufts, then administers "an

---

[106] *Id.* at 104.

[107] *Id.*

[108] *Id.*

[109] *AR* at 104.

[110] *Id.* at 105.

[111] *Id.*

[112] *Id.* at 106.

independent external review for final coverage determinations based on medical necessity."[113] The Plan provides the member "will have access to any medical information and records relating to [the] appeal" in the possession or control of Tufts, and the review panel will issue a final, binding coverage determination.[114]

The Plan also requires a member to exhaust the appeals process before a member may file a lawsuit against the Plan. Specifically, the Plan provides:

> **Limitation on Actions**
> You cannot file a lawsuit against [the Plan] for failing to pay or arrange for COVERED SERVICES unless you have completed the [the Plan's] MEMBER Satisfaction Process and file the lawsuit within two years from the time the cause of action arose. For example, if you want to file a lawsuit because you were denied coverage under this GROUP or INDIVIDUAL CONTRACT, you must first complete our MEMBER Satisfaction Process, and then file your lawsuit within two years after the day you were first sent a notice of the denial.[115]

## V.    The Coverage Denials

### A.    Cigna's Initial Denial

Cigna covered the first fourteen days of M.A.'s treatment at Fulshear—July 22, 2020 through August 4, 2020,[116] and Plaintiffs submitted a request to extend coverage for continued care at Fulshear.[117] On August 5, 2020, Cigna notified Plaintiffs of its decision to deny benefits for August 5, 2020 forward.[118] Dr. Gelman, a Cigna Medical Director board-certified in psychiatry, conducted the medical necessity review for M.A.'s continued treatment and

---

[113] *Id.*

[114] *Id.*

[115] *AR* at 108.

[116] *Cigna's Motion* ¶ 20; *Tufts' Motion* ¶ 9; *Plaintiffs' Motion* ¶¶ 48–56.

[117] *AR* at 260–61, 265.

[118] *Id.* at 291–94.

concluded M.A. no longer met the medical necessity criteria for residential treatment care.[119]

Cigna's initial denial letter provided the following reasons for denying benefits:

> Based upon the available clinical information, your symptoms do not meet the Cigna medical necessity criteria for Residential Mental Health Treatment for Adults for continued stay from 08/05/2020 forward as there is no current risk of harm to yourself or others. You do not have a severe and pervasive psychiatric disorder which results in significant impairment in multiple settings. You do not demonstrate a need for 24 hour/day monitoring and active treatment. Your family is involved in treatment. From the available clinical evidence, you could receive psychiatric treatment in a less restrictive setting.[120]

The August 5, 2020 letter referred Plaintiffs to Cigna's medical necessity criteria for mental health disorders for more information and provided information regarding the appeal process.[121]

### B.    Plaintiffs' Appeals of Cigna's Initial Denial

Plaintiffs submitted two Level One appeal letters on January 27, 2021—one for Cigna's denial of benefits from August 5, 2020 through October 19, 2020, and one for Cigna's denial of benefits from October 20, 2020 forward.[122] Plaintiffs included multiple documents with their appeal letters including, among other things, authorization to disclose M.A.'s medical records, M.A.'s 2017 neuropsychological evaluation report, letters from Dr. Steven Benyas and Dr. Lynn Porter, a statement from M.A.'s school, and M.A.'s medical records from McClean and Fulshear.[123] In their appeal letters, Plaintiffs contended the initial denial was based on incorrect criteria.[124] Specifically, Plaintiffs complained the Cigna reviewer used "acute level" medical

---

[119] *Id.*; *Cigna's Motion* ¶ 21–22; *Plaintiffs' Opposition to Cigna's Motion* at 3 (Plaintiffs do not dispute these facts).

[120] *AR* at 292.

[121] *Id.* at 292–94.

[122] *Cigna's Motion* ¶¶ 24–25; *AR* at 265–84, 1713–32.

[123] *AR* at 1708–09.

[124] *Plaintiffs' Motion* ¶ 61; *AR* at 268–73, 1716–20.

necessity criteria "to restrict the availability of the non-acute mental health care M.A. received."[125]  The letter Plaintiffs submitted from Dr. Benyas stated the following:

> I have treated [M.A.] from 04/14/2017 through 03/03/2020.  [M.A.'s] treatment at Fulshear Treatment to Transition has been, and continues to be, medically necessary for the treatment of her psychiatric illnesses.  This treatment is beneficial, and [M.A.'s] status is improving.  Without such treatment, [M.A.] would be at far higher risk for worsening symptoms and suicide.[126]

Dr. Porter's letter also supported M.A.'s treatment at Fulshear.  Specifically, Dr. Porter stated:

> [M.A.] is a patient of mine who is attending a special program in Texas to treat her Borderline Personality disorder and is improving under their techniques.  I am writing a letter for her current insurance company to cover these fees.  [M.A.] has been incorrectly treated/diagnosed when living in Massachusetts.  She participated in many therapy modalities and hospitalization with often the same results.  Ultimately, leading her to participate in high risk behaviors, culminating in her suicide attempt prior to finding this Texas program.[127]

Dr. Porter's letter did not include any specific information regarding when she provided what treatment to M.A. or state whether she had evaluated M.A. since M.A. had been in residential treatment at Fulshear.[128]

## C.    Defendants' Processing of Plaintiffs' Appeals

After receiving Plaintiffs' appeals, Tufts notified Fulshear the appeals were rejected because Fulshear failed to include a required claim review form.[129]  When Plaintiffs were notified of Tufts' rejection of the appeals, Plaintiffs' submitted a complaint to the Massachusetts Division of Insurance stating the appeals had been incorrectly categorized as provider appeals rather than member appeals.[130]  On May 7, 2021, Tufts confirmed it had miscategorized the

---

[125] *Plaintiffs' Motion* ¶ 61.

[126] *AR* at 1896.

[127] *Plaintiffs' Motion* ¶ 67; *AR* at 3081.

[128] *AR* at 3081.

[129] *Plaintiffs' Motion* ¶¶ 72–73.

[130] *Id.* ¶ 72.

appeals as provider appeals, and stated it would process Plaintiffs' appeals as member claims.[131]

Plaintiffs resubmitted the appeals to Tufts.[132]

### D.    Cigna's Appeals Denial

Two Cigna Medical Directors, both board-certified in psychiatry, reviewed Plaintiffs'

Level One appeals.  Dr. Mohsin Qayyum reviewed Plaintiffs' appeal for benefits from August 5,

2020 though October 19, 2020, and Dr. Karl Sieg reviewed Plaintiffs' appeal for benefits for

October 2020 forward.[133]  Cigna upheld its denial determination for both appeals.[134]

In a letter dated July 29, 2021, Cigna denied benefits from August 5, 2020 to October 20,

2020 and provided the following explanation:

> Based upon the available clinical information received initially and with this appeal,
> your symptoms did not meet Medical Necessity Criteria for continued stay at Acute
> Inpatient Mental Health Treatment for Adults from 08/05/2020 - 10/20/2020 as you had
> not recently demonstrated actions or made serious threats of harm to yourself or others
> as a result of a mental health disorder that were of such severity that you required the
> intensity of treatment intervention and 24 hour monitoring of a Residential Mental
> Health Treatment program for your safe and effective treatment.  You had not developed
> new symptoms and/or behaviors that required this intensity of service for safe and
> effective treatment.  Less restrictive levels of care were available for safe and effective
> treatment.[135]

Cigna's denial letter again referred Plaintiffs to Cigna's Medical Necessity Criteria and included

information regarding the appeals process.[136]  A form for requesting an independent external

review and additional information regarding the external review process was attached to Cigna's

denial letter.[137]

---

[131] *Id.* ¶¶ 73–74.

[132] *Id.* ¶ 75.

[133] *Cigna's Motion* ¶ 27; *AR* at 1659, 1662–64, 1695–98, 1702–06.

[134] *Cigna's Motion* ¶¶ 28–29.

[135] *AR* at 1663–64.

[136] *Id.* at 1663–80.

[137] *Id.* at 1670–80.

In a letter dated August 5, 2021, titled "Initial Medical Necessity Denial," Cigna upheld its denial for benefits from October 20, 2020 forward.[138]  The letter informed Plaintiffs their appeal had been reviewed by board-certified psychiatrist Dr. Sieg and provided the following justification for denial:

> Based upon my review of the available clinical information and Cigna's Behavioral Health Medical Necessity Criteria, medical necessity [sic] your symptoms did not meet the medical necessity criteria of Cigna Behavioral Health's Level of Care Guidelines for Residential Mental Health Treatment for Adults for continued stay from 10/20/2020 – 01/06/2022.  The treatment provided had led to sufficient stabilization of your symptoms so that you could be safely and effectively treated at a less restrictive level of care.  You were not reported to be voicing thoughts of harm to self or others.  You were not reported to be exhibiting aggression or disordered thinking.  You were described as in behavioral control.  You were able to care for your basic needs.  You were compliant with medications.  Your depression had improved.  You were participating in groups.  You were sleeping and eating adequately.  You had not developed new symptoms and/or behaviors that required this intensity of service for safe and effective treatment.
>
> Your family is involved in treatment.  Less restrictive levels of care were available for safe and effective treatment[.]  In addition, Cigna is denying benefit authorization of the requested services because the level of care rendered by this program was inconsistent with the level of care requested.  It appeared you were being treated at a lower level of care such as a transitional living program.[139]

The denial letter included information regarding how to appeal Cigna's denial determination and request an independent external review.[140]

## PROCEDURAL HISTORY

After receiving Cigna's denial letters for their Level One appeals, Plaintiffs initiated this lawsuit on July 19, 2022.[141]  Plaintiffs seek to recover Plan benefits under 29 U.S.C.

---

[138] *Id.* at 1695–98.

[139] *Id.* at 1695–96.

[140] *Id.* at 1696–98.

[141] *See Complaint.* The Administrative Record does not contain any information regarding a request for an external review or any external benefit determinations.  Neither party raises or disputes whether the appeals, one each for different dates of services, were Level One appeals.  Both parties appear to treat Cigna's initial notice of denial of benefits from August 5, 2020 forward as Cigna's first review and Cigna's review of the January 27, 2021 appeals as Cigna's final review.  *See Cigna's Motion* 10–11, 15 (stating Plaintiffs submitted their "Level 1" appeals and Cigna upheld the upheld the denial of benefits for both Level 1 appeals and referring to the appeal denial as the final

§ 1132(a)(1)(B), arguing Defendants breached their fiduciary obligations under ERISA by failing to provide coverage and failing to provide a "full and fair review" of their claim.[142]  Moreover, Plaintiffs assert Defendants violated the Parity Act because Defendants evaluated M.A.'s mental health claims using incorrect medical necessity criteria which resulted in a disparity between coverage for mental health benefits and analogous levels of medical or surgical benefits.[143] Specifically, Plaintiffs allege Defendants wrongly imposed acute care medical necessity requirements for subacute care.[144]

Now before the court are the parties' cross-motions for summary judgment.[145]  The Motions are fully ripe and ready for review.[146]

## LEGAL STANDARD

ERISA authorizes plan participants and beneficiaries "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of

---

adverse benefit determinations); *Tufts' Motion* 11–15, 18–19 (stating Cigna's denial conclusions were reached by three separate internal reviewers—Dr. Gelman, Dr. Qayyum, and Dr. Sieg); *Plaintiffs' Motion* ¶¶ 75–81 (stating Plaintiffs resubmitted their initial appeal, the appeal was denied, and Plaintiffs "exhausted their pre-litigation obligations").  The Tenth Circuit has held that "exhaustion of administrative remedies is an implicit prerequisite to seeking judicial relief under § 1132(a)(1)(B)." *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 467 (10th Cir. 1997).  However, exhaustion is not a statutory requirement and because Defendants do not argue Plaintiffs' claims should be barred for failure to exhaust their remedies, the court does not address the issue further.  *See id.*; *see also McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998) (stating because "ERISA itself does not specifically require the exhaustion of remedies available under pension plans, courts have applied this requirement as a matter of judicial discretion") (internal quotation marks and citation omitted).

[142] *Plaintiffs' Motion* at 18–22.

[143] *Id.* at 30–37.

[144] *Id.*

[145] Dkt. 57, *Cigna's Motion*; Dkt. 58, *Tufts' Motion*; Dkt. 59, *Plaintiffs' Motion*.

[146] Dkt. 57, *Cigna's Motion*; Dkt. 70, *Plaintiffs' Opposition to Cigna's Motion*; Dkt. 78, *Cigna's Reply*; Dkt. 58, *Tufts' Motion*; Dkt. 71, *Plaintiffs' Opposition to Tufts' Motion*; Dkt. 80, *Tufts' Reply*; Dkt. 59, *Plaintiffs' Motion*; Dkt. 68, *Cigna's Opposition to Plaintiffs' Motion*; Dkt. 69, *Tufts' Opposition to Plaintiffs' Motion*; Dkt. 79, *Plaintiffs' Combined Reply*.

[ERISA] or the terms of the plan[.]"[147]  Summary judgment is appropriate if the moving party establishes "there is no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law."[148]  When all parties move for summary judgment in an ERISA case, "summary judgment is merely a vehicle for deciding the case."[149]  "[T]he factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[150]  In contrast, because the Parity Act claim is a legal question of statutory interpretation, "the court will 'view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party.'"[151]

## ANALYSIS

The parties' cross-Motions address Plaintiffs' two causes of action: 1) a claim for wrongful denial of Plan benefits under ERISA for M.A.'s residential treatment at Fulshear, and 2) a claim for violation of the Parity Act.  Specifically, Plaintiffs contend Defendants did not provide a full and fair review by failing to engage with the physician letters Plaintiffs submitted with their appeals, and they claim Defendants' denial violated the Parity Act by applying the medical necessity criteria for acute inpatient care for M.A.'s subacute, intermediate residential treatment.

The court concludes Defendants adequately considered the letters from M.A.'s treating physicians, but Defendants erroneously analyzed M.A.'s eligibility using medical necessity

---

[147] 29 U.S.C. § 1132(a)(3).

[148] Fed. R. Civ. P. 56(a).

[149] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[150] *Id.* (internal quotation marks and citation omitted).

[151] *Theo M. v. Beacon Health Options*, 631 F.Supp.3d 1087, 1100 (D. Utah 2022) (quoting *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008)).

criteria for acute inpatient care.  Because an erroneous basis for denial is unreasonably arbitrary and capricious, the court grants Plaintiffs' Motion on this basis and does not reach the Parity Act issue.

## I.    Standard of Review

The court must first decide what standard of review applies.[152]  "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[153]  "If the plan vests such discretion in the administrator, a reviewing court will apply 'a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'"[154]  Accordingly, the validity of a claim to benefits under an ERISA plan often "turn[s] on the interpretation of terms in the plan at issue."[155]  Here, the parties dispute whether the Plan grants discretionary authority to Cigna, and it is Defendants' burden "to establish that this court should review [Cigna's] benefits decision . . . under an arbitrary-and-capricious standard."[156]

Defendants argue the Plan's utilization management program confers authority to Cigna to make coverage determinations at its sole discretion.[157]  Conversely, Plaintiffs contend the Plan lacks any language explicitly granting authority to Cigna.  Specifically, Plaintiffs argue the Plan "never mentions the phrase 'discretionary authority,'" and "has no . . . language to put a plan

---

[152] *Cigna's Motion* at 12–15; *Tufts' Motion* at 8–10; *Plaintiffs' Motion* at 16–18.

[153] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[154] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1266 (D. Utah May 29, 2020) (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)).

[155] *Firestone*, 489 U.S. at 115.

[156] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (citation omitted).

[157] *Cigna's Motion* at 12; *Tufts' Motion* at 8–9.

participant or beneficiary on notice that Cigna enjoyed discretionary authority to construe eligibility for benefits."[158]

In *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, the Tenth Circuit clarified the kind of policy language sufficient to grant discretion to an administrator.[159] In *Eugene S.*, an ERISA-governed insurer denied coverage for residential treatment costs.[160] The insurer's third-party plan administrator determined the beneficiary "qualified for intensive outpatient treatment, but not for residential treatment."[161] The plaintiff sought relief in district court and the district court, concluding an arbitrary and capricious standard of review applied, upheld the insurer's denial.[162] On appeal, the Tenth Circuit Court of Appeals explained, "[w]e have been comparatively liberal in construing language to trigger the more deferential standard of review under ERISA . . . [and] we have found arbitrary and capricious review appropriate where plan language defines 'needed' services as those determined by the plan administrator to meet certain tests . . . ."[163] The Tenth Circuit then looked to the plan language and concluded it sufficiently granted both the insurer and the third-party administrator discretion sufficient to warrant arbitrary and capricious review.[164] Specifically, the Tenth Circuit concluded the plan had discretion because it "limit[ed] 'Medically Necessary and Appropriate' services or supplies to those 'determined by [the plan's] medical director or designee(s)' to be such"[165]; the plan limited

---

[158] *Plaintiffs' Opposition to Cigna's Motion* at 5.

[159] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011).

[160] *Id.* at 1128.

[161] *Id.* at 1128.

[162] *Id.* at 1128–29, 1135.

[163] *Id.* at 1132 (citation omitted).

[164] *Id.* at 1132–33.

[165] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d at 1132.

payment to services that, "in [the plan's] judgment, are provided at the proper level of care"[166]; the plan reserved the "right to require that care be rendered in an alternate setting as a condition of providing payment for benefits if [the plan] determine[d] that a more cost-effective manner exist[ed]"[167]; and the plan stated Horizon "determine[d] what [was] medically necessary and appropriate under its Utilization Review and Management program."[168]  The Tenth Circuit also concluded the third-party claims administrator had discretion because the plan defined a "'Care Manager' as a person or entity designated by the plan to manage, assess, coordinate, direct and authorize the appropriate level of health care treatment," and provided different levels of coverage depending on whether the care manager authorized treatment for mental illnesses.[169]

Like *Eugene S.*, the Plan here contains language sufficient to grant Cigna discretion in reviewing claims.  The Plan includes a utilization management program by which "an authorized reviewer" determines whether "health care services provided to members are (1) medically necessary and (2) provided in the most appropriate and efficient manner."[170]  The Plan defines "Authorized Reviewer" as one who "reviews and approves certain services and supplies to members."[171]  He or she is Tufts Health Plan's "Chief Medical Officer (or equivalent) or someone that person names (which may include a delegate)."[172]  Lastly, the Plan also designates inpatient treatment for behavioral health and substance use disorders as a covered service that "may require approval by an authorized reviewer," and states the member is responsible for

---

[166] *Id.* at 1132 (internal quotation marks omitted).

[167] *Id.* (internal quotation marks omitted).

[168] *Id.* (internal quotation marks omitted).

[169] *Id.* at 1133 (internal alteration and quotation marks omitted).

[170] *AR* at 35–36.

[171] *Id.* at 117.

[172] *Id.*

ensuring the provider obtains approval from an authorized reviewer for out-of-network benefits.[173]  The court concludes this language is sufficient to grant Cigna discretion to make coverage determinations and triggers arbitrary and capricious review.[174]

## II.   Cigna's Denials were Arbitrary and Capricious

To determine whether Cigna's decision was arbitrary and capricious, the court must evaluate whether Cigna's decision was "consistent with the purposes of the plan."[175]  The court upholds the administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[176]  The court is "limited to considering only the rationale given by [Cigna] for [the] denial"[177] and reviews the record as a whole to determine whether substantial evidence exists to support the administrator's decision.[178]  The Tenth Circuit has identified the following administrative actions as arbitrary and capricious: unreasonable interpretations of an ERISA plan,[179] failure to "address an independent ground for paying

---

[173] *Id.* at 16, 49.

[174] *See Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 853 (10th Cir. 2020) (stating language that adequately grants discretionary authority "triggers" the more deferential arbitrary and capricious standard of review).

[175] *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007); *see also Tracy O.*, 807 F. App'x at 854 (stating "an interpretation inconsistent with the plan's unambiguous language" is arbitrary and capricious).

[176] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023) (internal quotation marks and citations omitted); *see also Tracy O.*, 807 F. App'x at 853 (stating that under an arbitrary and capricious review, "the administrator's decision will be upheld unless it is not grounded on *any* reasonable basis") (emphasis in original) (internal quotation marks and citation omitted); *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231–32 (10th Cir. 2012) (stating the "abuse-of-discretion standard" and the "arbitrary-and-capricious standard" are interchangeable in the ERISA context).

[177] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 801 (10th Cir. 2010); *see also David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1313 (10th Cir. 2023) ("[A] court reviewing an administrator's benefits decision cannot consider reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the claimant.").

[178] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) ("Substantiality of the evidence is based upon the record as a whole.").

[179] *Scruggs v. ExxonMobil Pension Plan*, 985 F.3d 1356, 1362–63 (10th Cir. 2009) ("[I]f the plan provision is unambiguous, and the plan administrator's interpretation differs from the unambiguous meaning, then the plan

benefits" raised by a claimant on appeal,[180] arbitrary refusal to "credit the opinions of a treating physician,"[181] and failure to consistently apply the unambiguous terms of an ERISA plan.[182]

Procedurally, ERISA requires an administrator to provide a participant "adequate notice in writing" that explains the specific reasons for a claim denial and "afford a reasonable opportunity . . . for a full and fair review . . . of the decision denying the claim."[183]  For a "full and fair" review, claimants must know what "evidence the decision-maker relied upon," have "an opportunity to address the accuracy and reliability of the evidence, [and] hav[e] the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[184]  Additionally, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," but administrators are not required to "accord special weight to the opinions of a claimant's physician" or provide an "explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[185]

The court concludes Cigna did not fail to engage with the medical opinions submitted by Plaintiffs.  However, the court also determines the denials were based on unreasonable, inconsistent interpretations of the Plan and were thus arbitrary and capricious.

---

administrator's interpretation is unreasonable, and the decision to deny benefits based on that interpretation is arbitrary and capricious.") (internal quotation marks and citation omitted).

[180] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309 (10th Cir. 2023); *see also Ian C.*, 87 F.4th at 1222 ("If an administrator's decision ignores an independent ground for coverage and there is scant evidence to refute the claimant's theory, then the decision fails arbitrary-and-capricious review.").

[181] *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2008)) (ellipsis omitted).

[182] *Id.* (citation omitted).

[183] 29 U.S.C. § 1133(2).

[184] *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

[185] *Nord*, 538 U.S. at 834.

### A.  Cigna Adequately Considered the Opinions of M.A.'s Treating Physicians

Relying on *D.K. v. United Behavioral Health* and *David P. v. United Healthcare Insurance Company*, Plaintiffs argue Defendants did not provide a "full and fair review" because Defendants "fail[ed] to engage with the opinions of [M.A.'s] treating caregivers" and provided only "conclusory interpretations" without reference to the medical records.[186]  Specifically, Plaintiffs complain "[t]he denial letters … make no mention of the treating professional opinions [of Dr. Benyas and Dr. Porter] that recommended M.A. receive residential care at Fulshear."[187]

In. *D.K.*, the district court reviewed denial of ERISA-governed benefits for a beneficiary's inpatient behavioral health care.[188]  The beneficiary engaged in extensive mental health treatment, including therapy and participation in multiple inpatient and outpatient treatment programs, before entering a long-term residential treatment facility.[189]  After an initial approved stay, the defendants, relying on a coverage provision that had been removed, denied further coverage.[190]  Reminding defendants the provision had been removed, the plaintiffs appealed and defendants again denied coverage, determining the long-term treatment was not a covered service.[191]  The plaintiffs appealed again and an external review yielded the same result.[192]  The denial letter from the last internal review stated the administrator considered "the

---

[186] *Plaintiffs' Motion* at 18–20.

[187] *Id.* at 19.

[188] *See generally*, *D.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2021 WL 2554109 (D. Utah Jun. 22, 2021), *aff'd*, 67 F.4th 1224 (10th Cir. 2023).

[189] *Id.* at *3 (stating the beneficiary had "11 psychiatric emergency room visits; five in-patient hospitalizations (totaling 58 days); four stints of residential treatment centers lasting 38 days, 57 days, 63 days, and 79 days (totaling 237 days); six enrollments into partial hospitalization programs (totaling 69 days); weekly individual therapy; family therapy; medication management from a psychiatrist; and some DBT therapy" before entering the long-term residential treatment program).

[190] *Id.* at *4.

[191] *Id.*

[192] *Id.* at *4–5.

medical record, case management notes, and appeal letter."[193]  The external review denial letter stated the administrator considered "the appeal information, denial letters, correspondence, . . . submitted medical information, submitted criteria, and the [s]ummary [p]lan [d]escription."[194]

The plaintiffs challenged the determination arguing, among other things, the defendants "incorrectly disregarded [the beneficiary's] treating physicians' opinions" and failed to "articulate how they applied the terms" of the benefit plan to the beneficiary's "medical history or current condition."[195]  The district court agreed.[196]  However, the court's conclusion was not based on a disregard for the physician letters or information the plaintiffs submitted with their appeal.  Rather, the court concluded the beneficiary's "medical history and her treating professionals' opinions [stood] in stark contrast to the denial letters' scant reasoning."[197]  Despite the beneficiary's very extensive prior mental health treatment, "the *only* reference to all of [the beneficiary's] medical history and professionals' opinions [was] a passing reference stating that the purpose of the treatment was to 'consolidate' [the beneficiary's] 'gains.'"[198]  Here, there is not a blatant discrepancy between M.A.'s medical history and Cigna's denial letters sufficient to conclude Cigna did not consider the opinions of M.A.'s treating physicians.  Unlike the denial letters in *D.K.* that lacked "*any* analysis, let alone a reasoned analysis,"[199] Cigna's denial letters

---

[193] *Id.* at *9.

[194] *D.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2021 WL 2554109, at *9 (D. Utah Jun. 22, 2021), *aff'd*, 67 F.4th 1224 (10th Cir. 2023).

[195] *Id.* at *8.

[196] *Id.* at *9.

[197] *Id.* at *10.

[198] *Id.* at *3, 10 (emphasis and quotation marks in original).

[199] *Id.* at *10 (emphasis in original).

reference behaviors "reported" and "described" in the medical records.[200]  Indeed, both denial

letters state all information submitted with Plaintiffs' appeals was considered.[201]

Plaintiffs also rely on *David P. v. United Healthcare Insurance Company* to support their

contention that Defendants failed to engage with the medical opinions of Dr. Benyas and

Dr. Porter.[202]  The court is similarly unpersuaded.  In *David P.*, the claims administrator denied

benefits for residential treatment at two different facilities for the beneficiary's mental health and

substance abuse disorders.[203]  During the appeals process, the defendants gave varying reasons

for denying coverage.  Defendants initially denied coverage based on failure to get

preauthorization.[204]  Plaintiffs appealed, asserting preauthorization was not required, and

submitted medical records.[205]  The denial on the first administrative appeal stated no clinical

information indicated treatment was required.[206]  With their second appeal, the plaintiffs

submitted a chronological history with extensive documentation and informed defendants the

reviewer "overlooked [the plaintiff's] substance use disorder as an independent ground for

coverage."[207]  The second appeal denial letter again stated there was no clinical information to

support residential treatment and made no mention of treatment for substance abuse.[208]

---

[200] *AR* at 1662–63, 1695–96.

[201] *See id.* at 1662 ("All the original information in your file and the information submitted with this request were reviewed."); *id.* at 1695 ("After a review of the information submitted, [Cigna] has determined that the requested services are not covered.").

[202] *Plaintiffs' Motion* at 19–20.

[203] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1301 (10th Cir. 2023).

[204] *Id.* at 1303.

[205] *Id.* at 1304.

[206] *Id.*

[207] *Id.*

[208] *Id.* at 1304–05.

On review, the district court concluded the denials were arbitrary and capricious because they were inconsistent, did not address whether the substance abuse disorder "provided an independent ground for coverage," and "failed to engage with the recommendations made by [the plaintiff's] treating care givers."[209]  In concluding the administrators did not engage with the opinions of the plaintiff's treatment providers, the court noted the initial appeal denial stated there was no clinical information to support treatment, and then, after the plaintiffs provided medical records and other documentation, the second denial again stated there was no clinical information indicating the plaintiff needed residential treatment.[210]  Thus, "under th[o]se facts," it was evident the administrators had ignored the documentation the plaintiffs submitted.[211]  In contrast, the record in this case does not contain any obvious disregard of the information Plaintiffs submitted.  As stated above, Cigna stated it *had* considered all the materials submitted with the appeal.  Additionally, Cigna was not required to "affirmatively respond" to the materials Plaintiffs submitted; the ERISA statute only requires the administrators to take the "materials and arguments into account."[212]  Accordingly, Plaintiffs have not demonstrated Defendants failed to provide a full and fair review in disregarding the medical opinions of M.A.'s treating physicians.

---

[209] *See David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309–10 (10th Cir. 2023).

[210] *Id.* at 1310–12.

[211] *Id.* at 1312.

[212] *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020) ("ERISA does not require plan administrators to accord special deference to the opinions of treating physicans, nor does it place a heightened burden of explanation on administrators when they reject a treating physician's opinion.") (internal quotation marks and citations omitted); 29 C.F.R. § 2560.503-1(h) (stating a full and fair review requires plaintiffs be provided an opportunity to submit comments, documents, records, and other information pertaining to the claim and the review "takes into account [all information] submitted by the claimant relating to the claim").

### B.  Cigna's Denials Were Arbitrary and Capricious Interpretations of the Plan

Although the court concludes Cigna did not fail to consider the letters of Dr. Benyas and Dr. Porter, the court nevertheless concludes Cigna's denials were arbitrary and capricious.  A decision that "fails to utilize the proper plan language or criteria" is arbitrary and capricious.[213] The court makes this determination "based on the language of the plan."[214]  Accordingly, the court "scrutinize[s] the 'plan documents as a whole and, if unambiguous, construe[s] them as a matter of law.'"[215]  "In making this determination, [the court] consider[s] the common and ordinary meaning as a reasonable person *in the position of the plan participant*, not the actual participant, would have understood the words to mean."[216]

Plaintiffs argue Defendants imposed "acute symptom requirements" for M.A.'s subacute care at Fulshear.[217]  Defendants counter "Plaintiffs cannot establish that 24-hour residential treatment care is 'subacute' rather than 'acute' treatment,"[218] and they insist Plaintiffs incorrectly "cast the medical necessity question as binary" because the criteria for acute inpatient care and residential treatment partially overlap.[219]  The court addresses these issues in turn and concludes

---

[213] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (stating the court considers whether a decision is "consistent with the purposes of the plan" in determining whether a denial of benefits was arbitrary and capricious) (citation omitted); *see also Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004) ("[A]ssuming full and expansive discretion has been conferred, then the plan administrator's interpretation of [an] ambiguous plan provision should be judged as follows: (a) as a result of reasoned and principled process . . . (d) consistent with the purposes of the plan." (quoting Kathryn J. Kennedy, *Judicial Standard of Review in ERISA Benefit Claim Cases*, 50 AM. U.L.REV. 1083, 1135, 1172 (2001))).

[214] *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008).

[215] *Id.* (quoting *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007)).

[216] *Id.* (emphasis in original) (internal quotation marks and citation omitted).

[217] *Plaintiffs' Motion.* at 35.

[218] *Tufts' Opposition to Plaintiffs' Motion* at 39.

[219] *Cigna's Opposition to Plaintiffs' Motion* at 30–31.

the Plan designates residential treatment as subacute care and Cigna arbitrarily and capriciously applied acute criteria in denying benefits for M.A.[220]

### A. Residential Treatment is Subacute Care Under the Plan

The court first addresses whether residential treatment is acute or subacute according to the language of the Plan. Cigna's Standards and Guidelines/Medical Necessity Criteria For Treatment of Mental Health and Substance Use Disorders distinguish between four levels of mental health treatment for adults: acute inpatient, residential, partial hospital, and intensive outpatient.[221] Cigna's descriptions and accompanying medical necessity criteria distinguish the levels of care by degree.[222] The Plan states both acute inpatient care and partial hospital care are intended to provide acute treatment.[223] Acute inpatient care is utilized when an individual needs intensive around-the-clock psychiatric and medical monitoring, acute management to prevent harm and ensure safety, and a "contained environment for specific treatments that could not be safely done in a non-monitored setting."[224] Partial hospitalization treatment provides only short-term acute care "for individuals who can maintain personal safety with support systems in the

---

[220] Although Plaintiffs present their incorrect-criteria argument in the context of the Parity Act, the court concludes Cigna's failure to apply the proper plan criteria was arbitrary and capricious because it was an inconsistent interpretation of the Plan. *See Raymond M.*, 463 F.Supp.3d at 1250 ("[A]n ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is arbitrary and capricious."); *Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206, 1213 (10th Cir. 2017) (concluding an administrator's decision that "misconstrued" the requirements for benefits was arbitrary and capricious); *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998) ("A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms.") (citation omitted). Because the court concludes Defendants' denials were arbitrary and capricious in applying the wrong criteria for benefits, the court does not reach the Parity Act.

[221] *AR* at 143–65.

[222] *See id.*

[223] *Id.* at 149 (stating acute inpatient care provides "[a]cute management to prevent harm or significant deterioration"); *id.* 157 (stating partial hospital treatment "is similar in nature and intensity to that provided in an inpatient hospital setting" and is meant "to respond to acute situations").

[224] *Id.* at 149.

community" without 24 hour supervision.[225]  The medical necessity criteria for acute inpatient and partial hospitalization treatment both require an acute mental health disorder and include criteria that mention actions or threats of harm to self or others.[226]

In contrast, residential treatment is "transitional in nature" and focused on returning the individual to the community.[227]  Intensive outpatient treatment provides time-limited care "for individuals who can maintain personal safety with support systems in the community" and have some ability to fulfill outside obligations.[228]  Residential treatment and intensive outpatient treatment do not require an acute mental health disorder and the medical necessity criteria include elements of independence and willingness to engage in treatment.[229]  Although the Plan does not explicitly delineate between acute and subacute care, from the perspective of a plan participant it is clear the Plan classifies residential treatment as something less than acute or subacute, so the administrator must apply the corresponding subacute residential medical necessity criteria in making benefits determinations.[230]

---

[225] *Id.* at 157.

[226] *See id.* at 151 (listing the following medical necessity criteria for acute inpatient care: "[t]he individual has been diagnosed with a severe and acute mental health disorder" and either "[i]t is likely that the individual is currently at imminent risk of causing serious bodily harm to him/herself or someone else" or "[i]t is very likely that serious harm will come to the individual due to a psychiatric illness, and that harm cannot be prevented at a lower level of care"); *id.* at 160 (listing the following medical necessity criteria for partial hospitalization: "[t]he individual has been diagnosed with a moderate-to-severe and acute mental health disorder" and "[t]he individual has recently demonstrated actions of or made serious threats of self-harm or harm to others, but does not require a 24 hour monitoring environment").

[227] *AR* at 153.

[228] *Id.* at 162.

[229] *See id.* at 156 (listing the following medical necessity criteria for residential treatment: a "moderate-to-severe mental health disorder," "[t]he individual is expressing willingness to actively participate in this level of care" and "able to function with some independence, [and] participate in structured activities in a group environment"); *id.* at 165 (listing the following medical necessity criteria for intensive outpatient care: a "moderately severe mental health disorder," the individual is "mentally and emotionally capable to engage in the treatment program," and "willing to engage in treatment").

[230] *See Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1275 ("[T]he Plan classifies [residential] treatment as subacute, so the administrator must apply subacute medical necessity criteria to benefits decisions for claimants seeking [residential treatment] care for subacute mental health and/or substance abuse conditions.").

### B.  Cigna Applied Acute Criteria in Denying Benefits for M.A.'s Subacute Care

The court agrees Cigna's denials are based, at least in part, on M.A.'s failure to meet are acute-level criteria.  Because the Plan classifies residential treatment as subacute care, applying acute inpatient medical necessity criteria in determining benefits was inconsistent with the Plan and arbitrary and capricious.

Cigna's medical necessity criteria for a continued stay for both acute inpatient and residential treatment require that "[t]he individual continues to meet all elements of Medical Necessity" for the specified level of care.[231]  In determining coverage eligibility for a continued stay, therefore, a reviewer first looks to whether the individual still meets the medical necessity criteria that qualified the individual for treatment in the first instance.

The Plan provides the following medical criteria to be admitted for acute inpatient mental health treatment:

> All of the following must be met:
> 1. All Elements of Medical Necessity must be met.
> 2. The individual has been diagnosed with a **severe and acute mental health disorder**, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders that is significantly impairing functioning.
> 3.  One or more of the following criteria must be met:
>> A. It is likely that **the individual is currently at imminent risk of causing serious bodily harm to him/herself or someone else** due to a psychiatric illness, (not due to intentional criminal behavior), as evidenced by:
>>> v)  A recent and serious **suicide attempt or threat of violence** toward others involving deadly intent or plan, OR
>>> vi)  A current expression of **suicidal intent or homicidal intent** with a plan for bodily harm that has a high likelihood of becoming deadly or causing serious injury, OR
>>> vii)  Recent, **serious and intentional self-injury** along with an inability to develop a reasonable plan for safety so that 24 hour observation, safety measures, and treatment are needed in a secure setting, OR
>>> viii)  **Recent violent, impulsive, and unpredictable behavior that is likely to result in harm to the individual or someone else**

---

[231] *AR* at 151–52, 156.

without 24 hour observation and treatment, including the possible use of seclusion and/or restraints in a secured setting.

B. **It is very likely that serious harm will come to the individual** due to psychiatric illness, and that harm cannot be prevented at a lower level of care as evidenced by:

   i) **The individual is unable to care for self** (nutrition, shelter, and other essential activities of daily living) due to his/her psychiatric condition so that imminent life-threatening deterioration is expected, OR

   ii) **The individual has irrational or bizarre thinking**, and/or severe slowness or agitation in movements along with interference with essential activities of daily living of such severity as to require 24 hour psychiatric/medical, nursing and social service interventions.

C. The individual has a secondary condition such that treatment cannot be provided at a less restrictive level of care as evidenced by:

   i) A life threatening complication of an eating disorder; OR

   ii) An active general medical condition … which requires that psychiatric interventions be monitored in a 24 hour psychiatric/medical setting, OR

   iii) The individual requires Electroconvulsive Therapy (ECT) and the initial trial requires a 24 hour psychiatric/medical setting.

   iv) Appropriate less restrictive levels of care are unavailable for safe and effective treatment.

D. Appropriate less restrictive levels of care are unavailable for safe and effective treatment.[232]

In contrast, the medical necessity criteria for residential mental health treatment states:

All of the following must be met:

1. All Elements of Medical Necessity must be met.
2. The individual is expressing willingness to actively participate in this level of care.
3. The individual has been diagnosed with a **moderate-to-severe** mental health disorder … and [exhibits] evidence of significant distress/impairment.
4. This impairment in function is seen across multiple settings such as work, home, and in the community, and clearly demonstrates the need for 24 hour psychiatric and nursing monitoring and intervention.
5. As a result of the interventions provided at this level of care, the symptoms and/or behaviors that led to the admission can be reasonably expected to show improvement such that the individual will be capable of returning to the community and to less restrictive levels of care.
6. The individual is able to function with some independence, participate in structured activities in a group environment.

---

[232] *Id.* at 151–52 (emphasis added).

7.    There is evidence that a less restrictive level of care is not likely to provide safe and effective treatment.[233]

Cigna's initial denial letter dated August 5, 2020, references both acute inpatient and residential treatment medical necessity criteria.  For example, Cigna states M.A. does not qualify for continued coverage because "there is no current risk of harm to [M.A.] or others."[234]  A current risk of harm is a medical necessity criterion for acute inpatient treatment but not residential treatment.[235]  On the other hand, the letter also states, "[y]ou do not have a severe and pervasive psychiatric disorder which results in significant impairment in multiple settings."[236]  Exhibiting significant impairment across multiple settings is a criterion for residential treatment and is not a criterion for acute inpatient treatment.[237]  Cigna's remaining bases for denial in the August 5, 2020 letter reference criteria applicable to both acute inpatient treatment and residential treatment: the "need for 24 hour/day monitoring and active treatment," family involvement, and the inability to "receive psychiatric treatment in a less restrictive setting."[238]

Both appeal letters address the medical necessity criteria for continued care, but in addressing the first criterion—the individual continues to meet all admission medical necessity

---

[233] *Id.* at 156 (emphasis added).

[234] *Id.* at 291–92.

[235] *Compare id.* at 151 (listing "the individual is currently at imminent risk of causing serious bodily harm to him/herself or someone else due to psychiatric illness" as a criterion for acute inpatient treatment admission) *with id.* at 156 (including no references to harm or threat of harm in the medical necessity criteria for residential treatment).

[236] *AR* at 292.

[237] *Compare AR* at 156 (requiring a "moderate-to-severe mental health disorder" that causes significant distress or impairment "seen across multiple settings such as work, home, and in the community" for residential treatment) *with id.* at 151 (including no mention of impairment across multiple settings as a criterion for acute inpatient treatment).

[238] *AR* at 292.  *Compare id. with AR* at 151 (listing the need for 24-hour psychiatric monitoring and treatment or intervention as a criterion for acute inpatient care), *and id.* at 156 (listing the need for 24-hour psychiatric and nursing monitoring and intervention as a criterion for residential treatment), *and id.* at 152 (listing family involvement and the inability to be effectively treated at a less restrictive level of care as an acute inpatient criterion for continued stay), *and id.* at 156 (listing family involvement and the inability to be effectively treated at a less restrictive level of care as a acute inpatient criterion for continued stay).

criteria—the letters reference medical necessity criteria for acute inpatient care.[239]  Indeed, the

July 29, 2021 denial letter explicitly states M.A. "did not meet Medical Necessity Criteria for

continued stay at Acute Inpatient Mental Health Treatment for Adults."[240]  The letter goes on to

explain that M.A. "had not recently demonstrated actions or made serious threats of harm to

[herself] or others as a result of a mental health disorder that . . . [she] required . . . 24 hour

monitoring of a Residential Mental Health Treatment program for . . . safe and effective

treatment."[241]  This language closely tracks criterion 3(A)(iv) for acute inpatient admission: "It is

likely that the individual is currently at imminent risk of causing serious bodily harm to

him/herself or someone else due to a psychiatric illness as evidenced by . . . behavior that is

likely to result in harm to the individual or someone else without 24 hour observation and

treatment."[242]  As Plaintiffs point out, the residential treatment medical necessity criteria do not

include *any* reference to harm or threat of harm to self or others.[243]

The August 5, 2021 letter also cites acute inpatient care medical necessity criteria.  This

letter states M.A. does not meet the medical necessity criteria because she was "not reported to

be voicing thoughts of harm to self or others," she was "not reported to be exhibiting aggression

or disordered thinking," she was "in behavioral control" and "able to care for [her] basic

needs."[244]  Medical necessity criterion 3(B) for acute inpatient care requires: "It is very likely

that serious harm will come to the individual due to a psychiatric illness . . . as evidenced by: i)

The individual is unable to care for self . . . OR ii) The individual has irrational or bizarre

---

[239] *Compare AR* at 151–52, *with id.* at 156, 1662–63, 1695–96.

[240] *Id.* at 1663.

[241] *Id.*

[242] *Id.* at 151.

[243] *Plaintiffs' Motion* at 31–32; *AR* at 156.

[244] *AR* at 1695.

thinking, and/or severe slowness or agitation in movements . . . ."[245]  The medical necessity criteria for residential treatment make no mention of thoughts of harm, irrational or disordered thinking, or being able to care for oneself.[246]

This court has addressed similar misapplications of Plan language in *James F. ex rel. C.F. v. CIGNA Behavioral Health, Inc.* and *Raymond M. v. Beacon Health Options, Inc.*  In *James F.* the court concluded Cigna's administrator arbitrarily and capriciously denied benefits "by applying criteria more appropriately applied to acute inpatient admissions and treatment" for the claimant's residential treatment.[247]  Specifically, Cigna stated the claimant was "not at risk of harm to [self]," but Cigna's "criteria for residential treatment admission [did] not require that the patient be 'a risk of harm to self or others.'"[248]  The court concluded the administrator's "failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits" was "not grounded on any reasonable basis," was "arbitrary and capricious[,] and [was] an abuse of discretion."[249]

*Raymond M.* is similar.  In that case, the plan administrator denied coverage for a continued residential stay by requiring the claimant to "prove acute-level conditions or symptoms" for subacute residential treatment.[250]  Specifically, the administrator denied benefits because the plaintiff did not have a disorder such that "there would be a danger to self or others," she was not "psychotic or aggressive," and did not exhibit an inability "to perform self-care

---

[245] *Id.* at 151.

[246] *Id.* at 156.

[247] *James F. ex rel. C.F. v. CIGNA Behavioral Health, Inc.*, No. 1:09-CV-070-DAK, 2010 WL 5395075, at *4–6 (D. Utah Dec. 23, 2010).

[248] *Id.* at *6.

[249] *Id.* at *6.

[250] *Raymond M. v. Beacon Health Options, Inc.*, 463 F.Supp.3d 1250, 1278–79 (10th Cir. 2020).

activity"—all criteria for acute inpatient care under the relevant Plan.[251]  The court concluded that by denying "benefits [that] relied on criteria that [were] based on 'interpretations that are inconsistent with the plain language of the Plan,'" the administrator "acted in an arbitrary and capricious manner."[252]  Although the administrator had discretion to interpret and administer the Plan, the "discretion [did] not stretch so far as to ignore the language of the Plan itself."[253]  The administrator's application of more stringent medical necessity criteria than required was arbitrary and capricious because it was "inconsistent with the plain language of the Plan."[254]

Cigna argues the administrator did not impermissibly refer to acute criteria in making benefits determinations because "the criteria for acute inpatient care and residential treatment partially overlap."[255]  However, the cases Cigna relies on for support all involve guidelines where the language of the acute/subacute medical necessity criteria explicitly overlap—the criteria have similar requirements and/or both use the term "acute."[256]  Such is not the case here. The acute inpatient medical necessity criteria Plaintiffs point to in the denial letters have no

---

[251] *Id.* at 1278.

[252] *Id.* at 1279–80 (quoting *Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206, 1213 (10th Cir. 2017).

[253] *Id.* at 1279.

[254] *Id.* at 1280 (internal quotation marks, alteration, and citation omitted).

[255] *Cigna's Opposition to Plaintiff's Motion* at 31; *see also Tufts' Opposition to Plaintiff's Motion* at 35–36 (arguing Plaintiffs' use of "labels of 'acute' and 'subacute' is insufficient" to prove disparate requirements because "there appears to be no meaningful difference between the selected . . . admissions criteria" despite the different language) (citing *M.Z. v. Blue Cross Blue Shield Ill.*, No. 1:20-CV-00184-RJS-CMR, 2023 WL 2634240 (D. Utah Mar. 24, 2023)).

[256] *See Mark M. v. United Behavioral Health*, No. 2:18-CV-00018-BSJ, 2020 WL 5259345, at *8, 10 (D. Utah Sept. 3, 2020) (stating the reference to the "suicidal or . . . imminent risk of self-harm" acute criterion was relevant in applying the residential treatment criterion of "the member is not in imminent or current risk of harm to self, others, and/or property"); *Anne M. v. United Behavioral Health*, No. 2:18-CV-808, 2022 WL 3576275, at *10 (D. Utah Aug. 19, 2022) (rejecting the plaintiffs' argument that the administrator required acute symptoms for subacute care because, under the Plan, residential treatment was medically necessary only if needed to address short-term "acute changes in the member's condition" that "renders outpatient treatment temporarily inadequate"); *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 591 (10th Cir. 2019) (concluding an implicit look at the acute care criterion of "imminent suicidal risk or danger to others" was relevant to the residential treatment criterion of "self-injurious or risk-taking behaviors that risk serious harm").

overlap with any residential treatment criteria.[257]  Additionally, the July 29, 2021 letter specifically states "your symptoms do not meet Medical Necessity Criteria for continued stay at Acute Inpatient Mental Health Treatment for Adults."[258]  The court concludes Cigna's denial of benefits was "based on interpretations that are inconsistent with the plain language of the Plan" and is therefore arbitrary and capricious.[259]

### III. Remedy

Having concluded Defendants' denial of benefits was arbitrary and capricious, the court "may either remand the case to the plan administrator for a renewed evaluation of [M.A.'s case] or . . . order an award of benefits."[260]  Plaintiffs argue the court should award benefits because a remand "runs a significant and problematic risk of creating an unfair 'heads we win; tails, let's play again' system of benefits adjudication in favor of defendant insurance companies."[261]  Not surprisingly, Defendants argue "the only appropriate remedy would be a remand of the claim back to Cigna for further review and/or further factual development of the record."[262]

---

[257] *See Plaintiffs' Motion* at 31–32 (listing the following acute inpatient medical necessity criteria identified in the denial letters: current risk of harm to self or others; voicing thoughts of harm to self or others; not exhibiting aggression or disordered thinking); *Plaintiffs' Opposition to Tufts' Motion* at 18–19 (same); *Plaintiff's Opposition to Cigna's Motion* at 22 (stating Cigna improperly based the denials on "no current risk of harm to self or others, and no serious threats of harm to yourself or others, and not voicing thoughts of harm to self or other no exhibiting aggression or disordered thinking") (internal quotation marks and citations omitted).

[258] *AR* at 1663.

[259] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1279 (10th Cir. 2020).; *see also Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (stating a benefits determination is arbitrary and capricious if it is not "consistent with the purposes of the plan"); *James F. ex rel. C.F. v. CIGNA Behavioral Health, Inc.*, No. 1:09-CV-070-DAK, 2010 WL 5395075, at *6 (D. Utah Dec. 23, 2010) (holding the "failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion," "not grounded on any reasonable basis and is therefore arbitrary and capricious") (citations omitted).

[260] *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008).

[261] *Plaintiffs' Motion* at 37 (quoting *Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 712 (C.D. Cal. 2020)).

[262] *Cigna's Opposition to Plaintiffs' Motion* at 36; *see also Tufts' Opposition to Plaintiffs' Motion* at 41 (stating "the only appropriate remedy is for a remand for Cigna to evaluate whether benefits are due").

The appropriate remedy "depends on the specific flaws in the plan administrator's decision."[263] "The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation."[264] An award of benefits is only appropriate "if the evidence in the record clearly shows that the claimant is entitled to benefits."[265] Here, the record does not clearly establish M.A. was eligible for coverage "[u]nder any reasonable interpretation."[266] Accordingly, remand is the proper remedy.[267] However, on remand, Cigna may not "reevaluate [M.A.'s claim] based on a rationale not raised in the administrative record."[268] Cigna's decision letters must identify the reviewers and their credentials and "list expressly the levels of care being applied, list each relevant criteria[,] and state in detail the facts considered in applying the criteria with citations to the administrative record."[269]

Plaintiffs also request an award of attorney's fees and costs pursuant to 29 U.S.C. §1132(g).[270] Under ERISA, the court has discretion to award attorney's fees in any action "by a

---

[263] *Flinders*, 491 F.3d at 1194.

[264] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002) (citations omitted); *see also Weber*, 541 F.3d at 1015 ("Where the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case." (internal quotation marks and citation omitted)).

[265] *Weber*, 541 F.3d at 1015.

[266] *Id.* (stating the court correctly awarded benefits because the claimant was eligible for benefits under any reasonable interpretation of the plan policy).

[267] *See Scott M. v. Blue Cross and Blue Shield of Massachusetts*, 528 F. Supp. 3d 1200, 1220–21 (D. Utah Mar. 24, 2021) (concluding remand was the appropriate remedy when the administrator did not evaluate the correct medical necessity criteria).

[268] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021).

[269] *Scott M.*, 528 F. Supp. 3d at 1221.

[270] *Plaintiffs' Motion* at 39.

participant, beneficiary, or fiduciary."[271]  In determining whether to award attorney fees under

section 1132(g)(1), the court considers the following factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the
> opposing parties to personally satisfy an award of attorney's fees; (3) whether an award
> of attorney's fees against the opposing parties would deter others from acting under
> similar circumstances; (4) whether the parties requesting fees sought to benefit all
> participants and beneficiaries of an ERISA plan or to resolve a significant legal question
> regarding ERISA; and (5) the relative merits of the parties positions.[272]

"No single factor is dispositive and a court need not consider every factor in every case."[273]

Considering these factors, the court concludes an award of attorney's fees is appropriate.

Cigna is responsible for erroneously assessing M.A.'s eligibility for benefits and can satisfy an

attorney's fees award.  Additionally, holding Defendants responsible may have a deterrent effect

for other improper benefit determinations.  Accordingly, the court awards Plaintiffs their

reasonable attorney's fees and costs and declines to award prejudgment interest.[274]

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment[275] is GRANTED

and Defendants' Motions for Summary Judgment[276] are DENIED.  On Plaintiffs' cause of action

for wrongful denial of Plan benefits, the court REVERSES the denial of Plaintiff M.A.'s benefits

for her entire residential treatment at Fulshear and REMANDS to Cigna for proper

reconsideration.  The court retains jurisdiction to reconsider Plaintiffs' request for attorney's fees

and costs following Cigna's reconsideration of Plaintiffs' benefits claim on remand.

---

[271] 29 U.S.C. § 1132(g)(1).

[272] *Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983).

[273] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citation omitted).

[274] *See* 29 U.S.C. § 1132(g).

[275] Dkt. 59.

[276] Dkt. 57; Dkt. 58.

The Clerk of Court is directed to close the case, subject to the court's retention of

jurisdiction over fee-related issues or a motion to reopen for good cause shown.


SO ORDERED this 10th day of March 2025.


BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge